■ TAPPAN MOTORS, INC., Respondent, v VOLVO OF AMERICA CORPORATION et al., Appellants. — In an action, *inter alia*, for a permanent injunction, defendants appeal from a judgment of the Supreme Court, Westchester County (Beisheim, J.), entered September 16, 1980, which, after a nonjury trial, *inter alia*, enjoined them from terminating plaintiff Tappan Motors, Inc., as a franchised Volvo dealer and dismissed the defendants' counterclaim for damages. Judgment reversed, on the law and the facts, with costs, plaintiff's complaint is dismissed, the parties' "sales agreement" is declared terminated and defendants' counterclaim for money damages is reinstated and remitted to the Supreme Court, Westchester County, for trial. Since November of 1960, Tappan Motors, Inc. (Tappan) has been a regularly franchised Volvo dealer. This franchise relationship was most recently reaffirmed in a contract, denominated a "sales agreement", dated May 8, 1973, which provided, *inter alia*, the following: Paragraph I(G) — "Dealer will use its best efforts to promote and develop sales and service of Company Products in its Area of Responsibility.";

and Paragraph IV, CLAUSE 8 — SERVICE PARTS "A. Dealer at all times will keep in Dealer's place of business an inventory of Service Parts of an assortment and in quantities that are necessary to meet the current and reasonably anticipated service requirements of Dealer's customers." Insofar as is here pertinent, the agreement also provided for its termination at the behest of the distributor upon 30 days' written notice in the event that the dealer fails to correct any default in performance of its responsibilities under the foregoing provisions within 60 days after written notice of such default. By letter dated July 18, 1979, defendant Volvo of America Corporation informed Tappan that it believes that the latter was in default of various obligations under the afore-mentioned sales agreement, and that it had 60 days within which to correct the named defaults. Subsequently, by letter dated September 25, 1979, Volvo informed Tappan of its belief that the dealer had not corrected the various defaults and that, pursuant to contract, their sales agreement would be terminated effective November 5, 1979. As a result of this letter Tappan commenced the instant action and, after a lengthy trial, Trial Term agreed with plaintiff that Volvo was not justified in terminating their agreement. We disagree. The applicable statute is section 197 of the General Business Law, which provides: "Termination of contracts for sales of motor vehicles. No manufacturer or distributor, or any agent of such manufacturer or distributor, shall terminate any contract, agreement, or understanding or renewal thereof for the sale of new motor vehicles to a distributor or dealer, as the case may be, *except for cause.*" (Emphasis supplied.) As written, section 197 of the General Business Law is apparently intended to protect not only automobile dealers, but also those members of the buying public who purchase their wares. Thus, it was declared by the Legislature, in amending article 11-A of the General Business Law (of which § 197 is a part), that: "the sale of motor vehicles to the public in [this] state under the franchise system includes more than the mere transfer of title[, it] being a continuing obligation of the manufacturer, distributor and dealer to the buying public affecting the public interest; that the termination or failure of the established relationship between the manu-facturer, distributor and dealer without cause or good faith denies to the general buying public its right to availability of continuing post-sale mechani-cal and operational service and precludes the relationship, expected and implied at the time of sale, between the buyer and the seller necessary to insure safe operating condition of the vehicle. The legislature further finds and declares that the distribution and sale of motor vehicles in the state under the franchise system vitally affects commerce, the general economy of the state and the welfare of the citizens of the state requiring the exercise of its police power to insure the public welfare, to regulate commerce, to establish guide-lines for enforcement of a fair and equitable balance between parties to such franchises, and to provide judicial relief from unfair and inequitable practices affecting the public interest." (L 1970, ch 582, § 1.) Consistent with the foregoing, it is our view that in order to accomplish its salutary purpose, section 197 of the General Business Law should be read as precluding a distributor such as Volvo from terminating a franchised dealer either in bad faith or in the absence of good cause shown (cf. General Business Law, § 197-a), and that such authority as may exist to the contrary should not be followed (see, e.g., *P. J. Grady, Inc. v General Motors Corp.*, 472 F Supp 35; *Cycleway, Inc. v Kawasaki Motors Corp., U. S. A.*, 77 Misc 2d 829). Accordingly, any indication that Volvo was acting in bad faith or for inconsequential, vindictive or coercive reasons would be fatal to its defense of this action. Applying the foregoing considerations to the case at bar, we find from the evidence pre-sented at trial (1) that Tappan had repeatedly experienced problems in

servicing Volvo automobiles, (2) that Tappan's facilities were neither as large nor as clean as Volvo required, (3) that some of the specialized tools required for servicing Volvos were missing from Tappan's premises, (4) that certain of Volvo's factory service manuals were also missing, (5) that Volvo customers at Tappan were subjected to inconvenience and excessive waiting times for repairs, (6) that Tappan failed or refused to keep an adequate inventory of Volvo parts, (7) that Tappan delayed installation of a computer system for the control of its parts inventory until after its termination was scheduled to take effect, and (8) that Tappan repeatedly complained about its allocation of automobiles and threatened to dissuade customers from purchasing a Volvo elsewhere if *Tappan* could not supply them with the Volvo model of their choice. These factors, considered jointly, were more than sufficient to justify Volvo's decision to terminate Tappan's franchise pursuant to the contract and in accordance with section 197 of the General Business Law. Moreover, there is no indication that Volvo acted other than in good faith in deciding to terminate the instant contract. Lazer, Gulotta and Margett, JJ., concur.

Titone, J. P., dissents and votes to affirm the judgment, with the following memorandum: Historically, statutes regulating automobile manufacturer-dealer relationships, such as, *inter alia,* section 197 of the General Business Law, entitled "Termination of contracts for sales of motor vehicles", were enacted by State Legislatures not only to protect the buying public, but also as a matter of public policy, to furnish automobile dealers with some protection against unfair treatment by manufacturers. Implicit in such laws is the recognition of gross disparity of bargaining power between the manufacturers and local retailers and the recognition of a long history of abuse of dealers by manufacturers (*Forest Hill Dodge, Inc. v Karns,* 29 Wis 2d 78, 84-86; see Constitutional Obstacles to State "Good Cause" Restrictions on Franchise Terminations, 74 Col L Rev 1487, 1489-1493). In essence, such statutes remove the question of substantial compliance with the obligations of the agreement from unilateral determination by the franchisor and place it before the court, with the burden of proof resting on the franchisor (see *Shell Oil Co. v Marinello,* 63 NJ 402, cert den 415 US 920). As a result, "good cause" or "cause" has become a sweeping regulation of the franchise relationship as a standard for a unilateral termination thereof by the franchisor (see 74 Col L Rev 1487, 1493). In determining that Volvo had sufficient cause to terminate Tappan's franchise under the New York statute (General Business Law, § 197), the majority sets forth eight factors considered by it jointly to justify its action. One was that Tappan repeatedly complained about the allocation of automobiles Volvo furnished it for retail sale and threatened to dissuade customers from purchasing a Volvo elsewhere. With respect to the first prong of such factor, I submit that complaints by an automobile dealer to the effect that customer demand for the manufacturer's product or certain models thereof greatly exceeds supply does not warrant criticism, let alone being used as one of the bases for termination of the dealer's franchise. If anything, such complaints were undoubtedly symptomatic of the fact that defendants' product had great marketability at the time and that defendants were enjoying significant financial and business success. It is belaboring the obvious to state that over the past few years the automobile industry has suffered immeasurably not from a surfeit of dealer demands for its products but, rather, from a devastating lack of demand. As to the second prong, i.e., Tappan's alleged threats to dissuade customers from purchasing Volvos elsewhere, such conduct on the part of Tappan's officers, if true, cannot be condoned. What is patently evident from the record herein is that at times relations between representatives of the parties became strained, discussions at meetings were heated, tempers became short and, as a result, things were

said which would have been better left unsaid. However, no evidence was ever adduced at the trial that representatives of Tappan had in fact ever induced potential customers of Volvo to refrain from purchasing from other dealers vehicles manufactured by defendants, or that defendants were intimidated or otherwise deleteriously affected by the alleged threats. The majority also cites as one of the reasons for justifying Volvo's termination of Tappan's franchise the fact that some specialized tools required to service the former's vehicles were missing from Tappan's premises. Yet the record reveals, as reflected in the following colloquies during the cross-examinations of Philip Bradshaw, Volvo's regional service manager in 1978 of the territory which included Tappan, and Michael F. Babos, Volvo's regional service manager in 1979 of the same area, that the number of tools that were missing at any time was minimal at most: BRADSHAW — "Q. And did there come a time when you actually inventoried the tools yourself? A. I inventoried the tools both times, sir. Q. Did you inventory the tools on August 30, 1978? A. Yes, I did. Q. *And isn't it a fact that on that date there was only $130.64 of missing tools out of a total of approximately $5,200.00? A. That's correct.*" (Emphasis supplied.) BABOS — "Q. Mr. Babos, I show you a document marked as Plaintiff's Exhibit 11 in evidence in this case, purportedly a Volvo special tool inventory report dated 8/24/79. Did you make out that report? A. Yes, I did. Q. Did you say you did this inventory on the 23rd? A. Yes, I believe I did. Q. But you dated the report the 24th? A. I dated the report incorrectly. * * * Q. Mr. Babos, looking at that report, how many tools did you find were missing? A. Ten. Q. * * * Actually, of those ten tools five were new tools. Right? A. Yes. They were tools for the '80 product car. * * * Q. Do you know how many tools are on this list * * * A. I don't know the exact number, no. Q. *Is it fair to say a couple of hundred? A. I would think so.*" (Emphasis supplied.) In connection with the majority's giving important consideration to the fact that service manuals were missing at Tappan's place of business, the following colloquy during cross-examination of Babos is also revealing: "Q. As to the manual check that you performed [8/23/79], you performed that on the same day as the tool inventory, didn't you? A. Yes. Q. *And there were very few manuals that were missing. Right?* A. Yes. Q. And you were told by someone at Tappan, weren't you, that they often let mechanics take these manuals overnight to study them? A. Yes. He mentioned that, and also that they might have had them out in the shop, and that he would try to locate the manuals by my next visit." (Emphasis supplied.) From the colloquies, rather than according any weight to the fact that a minimal number of tools and manuals were either missing or misplaced when the inventories were taken, I am of the opinion that the adage *"Lex non curat de minimis"* would be much more appropriate.[1] Under its terms "(6)" and "(7)" as bases for upholding Volvo's termination of Tappan's franchise for the latter's failure to correct inadequacies at its business premises, the majority holds: "(6) that Tappan failed or refused to keep an adequate inventory of Volvo parts," and "(7) that Tappan delayed installation of a computer system for the control of its parts inventory until after its termination was scheduled to take effect". There is some merit to the majority's finding under item "(6)" in that Tappan employees engaged in daily maintenance often had to send a truck to the Volvo parts depot some 15 to 20 minutes traveling time from Tappan's premises in order to obtain necessary parts for vehicles under repair. However, in an effort to correct the inventory of parts problem, and contrary to the majority's finding that Tappan was dilatory in installing the inventory computer system, the record clearly demonstrates (a) that in May, 1979, or more than a month before Tappan received the July 18, 1979 letter from Volvo in which "[f]ailure to stock an adequate parts inventory" was

---

1. "The law cares not about trifles."

included as a deficiency, the president of Tappan, George Kahn, initiated a conversation with Dominic Sorresso, a salesman from Automatic Data Processing, about having a computer inventory system installed at Tappan; and (b) in late June, 1979, also before the July 18, 1979 letter from Volvo was received by Tappan, Sorresso met Kahn at Tappan's place of business and had a second conversation relative to the installation of a computer inventory control system. Kahn at that time again voiced a willingness to take steps to install such a system as soon as an inventory of parts was completed. In September, 1979, Kahn, this time by telephone, advised Sorresso that he was still getting his inventory together. Furthermore, shortly after the middle of October, 1979, which although subsequent to Volvo's termination letter sent to Tappan, dated September 25, 1979, was prior to the termination date of November 5, 1979, set forth therein, Kahn's secretary arranged an appointment for Sorresso at Tappan for November 2, 1979. On the latter date Kahn signed a service agreement with Automatic Data Processing "to go on an inventory control system", which system was completely installed by January or February, 1980. It should also be noted that Willett G. Seltenheim, the marketing analyst in Volvo's parts division, testified that as of August 30, 1979, which date was within the 60-day period that Tappan was directed to correct its alleged defects, he, Seltenheim, (1) was aware, based on a statement made by Kahn, that Tappan intended to install a computerized inventory system, and (2) was also told by an employee of Tappan that an inventory of parts was already being conducted on Saturdays and at night. In my opinion the above facts detailed on this issue indicate that Tappan, both before and during the 60-day period covered by the letter of July 18, 1979, and before the termination date of November 5, 1979, had taken meaningful and significant steps toward the requirement that it stock an adequate inventory of Volvo parts. The majority also alleges as justifiable grounds for the termination of Tappan's franchise that Volvo had demonstrated at the trial that Tappan had "repeatedly" experienced problems in servicing Volvo automobiles, that Volvo customers were subjected to inconvenience and excessive waiting time for repairs, and that Tappan's facilities were neither as large nor as clean as Volvo required. With respect to the purported "inadequate" facilities of Tappan, it must be noted at the outset that as a result of an inquiry made by Volvo in September or October, 1960, Tappan became a franchised Volvo dealer in November of that year, and during the ensuing 20 years the dealership has been at the same location and area in North Tarrytown, Westchester County. As cogently pointed out by the Trial Judge, for Volvo to expect that Tappan's physical plant could be substantially increased or materially changed within the 60-day time limit set forth in the letter of July 18, 1979, was unreasonable and unfair. Moreover, what the majority did not take into account is the fact that Tappan went to significant lengths both during the 60-day period and prior to receiving the letter of termination dated September 25, 1979, to meet Volvo's objections with respect to customer inconvenience and excessive waiting time for repairs. For instance it added a new customer lounge, added four more personnel to "write up" repair and maintenance invoices for persons dropping off their vehicles for service, black-topped a service parking lot, completed the painting of the entire facility, and signed up additional mechanics for training in servicing Volvo vehicles. Insofar as Tappan "repeatedly" experienced problems in servicing automobiles manufactured by Volvo, the primary evidence adduced by Volvo in that regard consisted of the testimony of three of Tappan's customers. One of them, a Mrs. Brosnahan, had a legitimate complaint. Although promised a car on three separate occasions by Tappan's representatives for the period her automobile was to undergo maintenance, no

such vehicle was made available to her on any of the occasions. However, with respect to her complaints relative to the servicing of her automobile, the record does not demonstrate that Tappan's mechanics had "repeatedly" experienced problems in connection therewith. Rather, from the cross-examination of Mrs. Brosnahan, it seems evident that the defects in her vehicle's air conditioner and starting mechanism were serviced by Tappan's mechanics without any apparent difficulty. With respect to Volvo's witnesses Bazerman and Wyble, concededly there was a delay in each instance before the defect complained of was corrected by Tappan's mechanics. However, with respect to Bazerman, evidence adduced at the trial raises a fair inference that correction by Tappan of the defect in the starter of Bazerman's vehicle, a "product" defect, was delayed either wholly or in part because Tappan had difficulty in obtaining authorization from Volvo to repair such defect under the manufacturer's warranty. The record also reveals that after Wyble's vehicle was eventually serviced at Tappan, he sent a complimentary and laudatory letter to the mechanic who made the repairs. In sum, the critical testimony of just these three of Tappan's former customers, when contrasted with the fact that at the time of trial, Tappan, as a franchise dealer, had sold and serviced Volvos for approximately 20 years, does not, as a matter of law, constitute sufficient evidence to support findings that in effect Tappan's servicing of Volvos over the years was generally inadequate, procrastinating and problem prone. Lastly, I do not quarrel with the majority's finding that Tappan's facilities were not as clean as Volvo required. The record does support a conclusion that for too long a time, the management of Tappan had permitted the service area to become disheveled, sloppy and disorganized. However, what the majority has not considered is that, during the 60-day period which Tappan was given to correct this problem, testimony, *inter alia,* of witnesses who were employees of Volvo, indicated that significant efforts and progress had been made by Tappan to that end. According to Willett G. Seltenheim, then Volvo's regional parts manager for the New York district, on his visit to Tappan's service areas on July 30, 1979, he saw some effort to "straighten out" the parts department. The aisle for Volvo parts had been swept and matter lying on the floor had been picked up. On his visit a month later, August 30, 1979, he again noticed that there had been some progress by Tappan in trying to straighten out the parts department. Warren Donohue, district service manager for Volvo, testified that when he visited Tappan on August 22, 1979, he noted the following: "Q. Now going on, Mr. Donohue, 2 (b) which refers to the 60-day letter * * * in the 60-day letter it says, 'Failure to properly maintain the service area,' and in Plaintiff's Exhibit 9 in evidence, your answer was, 'A visual inspection showed a recent cleanup had taken place,' * * * Now, how did you know it was recent, the cleanup? A. I based that on the reports that I had read that said the place needed a very good cleanup and *the visual inspection of the place was a lot cleaner than the last time I was there and cleaner than what was described in the last contact reports.* * * * Q. Mr. Donohue, one of the complaints which you voiced at the August 14 meeting was that the Tappan Motors service area was dirty and cluttered; isn't that correct? A. Correct. Q. And when you came on August 22, it had been cleaned up; isn't that correct? A. *It had been improved, yes.*" (Emphasis supplied.) What is patently obvious from the record is that Volvo, although it technically complied with the sales contract it had with Tappan by giving the latter a 60-day notice to correct any default in performance or else suffer termination, at most made superficial efforts during that period to ascertain whether or not Tappan was spending significant time, money and energy to comply with Volvo's demands. It should be noted that although the 60-day letter was sent to Tappan on or about July 18, 1979, it was

not until August 14, 1979, 27 days later, that Tappan was able to have a meeting with Volvo's district service manager (Donohue), its then regional parts manager (Seltenheim) and its New York district manager (Merrill). It was not until this meeting that Tappan's president, George H. Kahn, was warned specifically that if he wanted to keep his dealership, he would have to provide four trained Volvo mechanics, four Volvo service stalls, an adequate parts inventory, a customer reception area and adequate customer parking.[2] Moreover, it was not until August 22, 1979, more than a month after the 60-day letter was mailed to Kahn, that two of Volvo's representatives, Donohue and Babos, were sent to inspect Tappan's facilities ostensibly to see what corrective actions had been taken to comply with the 60-day letter and what the dealer intended to do. It must also be pointed out that for almost the last one third of the 60-day period Tappan had to correct the defects in question, the District Manager for Volvo (Merrill), as well as other of its top representatives, demonstrated a total lack of interest as to whether or not Tappan had made any significant progress in that regard. The record reveals that Donohue and Seltenheim, at Merrill's direction and Kahn's request, inspected Tappan's facilities on August 30, 1979, or approximately 18 days before the expiration of such period. Both admitted at the trial that they never returned to Tappan for any further physical inspection of the dealership service facilities after August

2. That Kahn took meaningful affirmative action to meet Volvo's specific demands set forth at the August 14, 1979 meeting is evidenced by his uncontradicted testimony describing what was done by Tappan between August 30, 1979 and late September, 1979, to wit: "With reference to the general program, there was a new roof installed on 300 North Broadway. The blacktop on the 300 North Broadway Service Department parking lot was repaired. The painting which had been begun during the summer of the offices of the Service Manager and Service Director's offices was continued and completed. We completed painting the shop areas and the lower showroom areas. The paint was completed. * * * As to the Parts Department, your Honor, we continued the inventory and completed it so that it would be put, be able to be put on a computer system. We also took the house across the street and built additional bins and shelves for additional Parts storage in that area. As far as the shop was concerned and equipment, we bought a brake drum and lathe machine which was delivered to us in September of '79 so that we would not have to sublet or send out any of our rotors or brake drums to be cut or ground. With regard to the Service Department, we assigned four men to the write-up desk in the morning. That is when the customers come in with their Service cars in the peak hours which are from 8 to 9:30 in the morning. Four men were assigned to it and a Service Secretary. The fourth man was the assistant to the Warranty Manager, and he was given the hours from 8 to 9:30 to stay at that desk and help them at peak times. We also replaced the Service secretary with a new one — her name was Robin Imray — who had some experience in customer relations. And she then took over the complete job of making Service appointments for customers, following up any inquiries they had, calling them telling them when their car was ready. When they came to pick up the cars in the evening, she cleared their credit cards and took care of the final preparation in checking over the bills so that they were correct, and expedited the customers' entrance and exit from the dealership. We hired — we had had on the payroll a part-time girl, and we hired her once again, a high school girl, to work part-time and file the Service bulletins and technical bulletins and the copies of the customer repair orders that are kept in the Service Director's office for fast reference. With regard to the customer lounge area, although we felt that the lounge we had in the 300 building was sufficient, as most people would leave their cars in the morning and go about their daily chores, we added an additional lounge in 310 North Broadway. We put five chairs and a table in and approximately 180 square feet was devoted to that in the lower showroom. As far as training of mechanics, we signed up and assigned Mr. Ed Fish to attend Volvo school — CIS School was their title of that school — on September 27th and September 28th. During September, I believe about the 21st of September, we assigned Mr. Wayne Jackson to attend the 1980 Products School, which was held on October 16th, which was a Volvo training school held in Rockleigh, New Jersey."

30. Moreover, Merrill, who as district manager was evidently in charge of the Tappan matter, testified that he knew of no contacts by Volvo with Tappan between the visits in August by Donohue and Seltenheim, and the sending of the termination letter on September 25, 1979. As a result, he did not know what, if anything, Tappan had done to correct any parts deficiencies set forth in the 60-day letter, *nor did he recall taking any steps to find out what Tappan had done between the visits in August discussed above, and the termination letter of September 25.* That Volvo had what might be considered less than a burning curiosity to ascertain what efforts Tappan had taken and was taking to save its franchise, is also evident from what transpired shortly before and also subsequent to September 25, 1979, the date on which Volvo sent written notice to Tappan that its franchise would be terminated as of November 5, 1979. According to Kahn, he called Merrill on or about September 5, 1979, for the purpose of inviting him to have another personal inspection of Tappan. Merrill never returned his call. Furthermore, although Merrill testified that at the August 14 meeting he agreed to visit the Tappan dealership, he never did so. Another glaring example of Volvo's intransigence in this dispute was demonstrated by what occurred at a meeting that Kahn had at his request with Bjorn Ahlstrom, the president of Volvo. In his briefcase which he brought to the meeting, Kahn had documents and records showing what had been done and what it intended to do relative to the 60-day letter. However, Merrill refused to allow him to open his briefcase for such purpose and Ahlstrom declined to meet with Kahn alone. Such a hard line stance on the part of Volvo's top executive totally belies the following testimony of Joseph L. Nicolato, senior vice-president of Volvo, with respect to Volvo's position on possible reconsideration of the termination decision between September 25 and November 5: "I think it fair to say that had evidence been put in before me that demonstrated a sincere desire on the part of Tappan Motors, not only desire, but a subsequent execution moving from verbalization to demonstration, had Tappan demonstrated in a materialistic way or some serious efforts to make those improvements or finish those improvements, there is no question in my mind that the termination letter would have been rescinded. We are not in the business of terminating dealers." Also, it must be observed that Nicolato was, by his own admission, present at the November 1 meeting that Kahn had with Volvo. Despite his protestation that Volvo's top representatives would have been receptive to evidence of Tappan's efforts toward complying with the terms of the 60-day letter, there is nothing in the record to indicate that at the November 1 meeting Nicolato overruled Merrill's arbitrary action and supported Kahn in his efforts to have such evidence considered. Simply put, throughout this episode Volvo evinced an attitude that not only would it not assist Tappan in its efforts to comply with the terms of the 60-day letter (as it specifically promised therein), but that the sending of such missive was a contractual formality which had to be observed before its irrevocable decision to terminate Tappan's franchise could be effectuated. In essence, the position taken by Volvo in this case is that Tappan had failed to rectify the deficiencies set forth in the 60-day letter, and thus, pursuant to the sales contract entered into by the parties in 1973, must now suffer forfeiture of its dealership, even though it has been a Volvo dealer since November, 1960. However the law is settled that forfeitures are not favored either in law or equity, and before a forefeiture will be enforced the right thereto must clearly appear to have arisen (*Matter of Herzog,* 301 NY 127; *Savery v Commercial Travelers Mut. Acc. Assn. of Amer.,* 238 App Div 189; *Rembold Motors v Bonfield,* 155 Ind App 422; *Rocha v McClure Motors,* 64 Wash 2d 942; *Montgomery Ward & Co. v Reisch,* 131 Col 407; 17A CJS, Contracts, § 407). Courts will avoid, or relieve

against, a forfeiture wherever possible where it can be done without doing violence to the contract between the parties (*Rockaway Park Series Corp. v Hollis Automotive Corp.*, 206 Misc 955, affd 285 App Div 1140; 17A CJS, Contracts, § 410). In this instance, the three primary bases for terminating Tappan's franchise were its alleged failure or refusal to keep an adequate inventory of Volvo parts, its delay in installing a computer system for control of its parts inventory, and the alleged disheveled and disorganized conditions at the dealership facilities itself. Yet the record clearly reveals that Tappan had taken affirmative steps during the 60-day period to remedy the Volvo parts problem by conducting an inventory thereof and by engaging in negotiations which led to the ultimate installation of a computer control system. Furthermore, although Tappan concededly had not organized and cleaned up its facilities in the 60-day period entirely to Volvo's satisfaction, perhaps to some degree because of limitations of space at the dealership, the fact is that Tappan had addressed itself to the problem and taken measures to correct it. For its part, Volvo, although assuring Tappan in the 60-day letter that "[a]s always, Volvo stands ready to assist in the correction of the serious deficiencies noted above," not only did not offer a helping hand, but during the period in question, only superficially monitored Tappan's efforts to meet its demands. Taking into account that (1) Tappan at the time of trial had been a Volvo dealer for about 20 years, (2) it was, according to Merrill, "carrying" its "weight as far as sales went", (3) Volvo's interest in ascertaining the extent of Tappan's compliance with its demands ranged from cursory observances to crass indifference, and (4) Tappan did expend significant time, effort and money to satisfy such demands, I am of the opinion that the penalty of forfeiture in this instance is totally unwarranted. Equity abhors forfeitures and has jurisdiction which it will exercise in a proper case to grant relief from their enforcement (30 CJS, Equity, § 56; cf. *Fifty States Mgt. Corp. v Pioneer Auto Parks*, 46 NY2d 573, 577). In order for a court to enforce a forfeiture there must be clear proof of the right thereto. Every reasonable presumption is against a forfeiture and every intendment or presumption is against the party seeking to enforce it (17A CJS, Contracts, § 407). Moreover, not every breach of a contract justifies the invoking of a rescission or forfeiture provision therein (cf. 17A CJS, Contracts, §§ 422[1], 457). The law is slow to impute that such a drastic remedy is intended where the significance of the default is grievously out of proportion to the oppression of the forfeiture (*Jacob & Youngs v Kent*, 230 NY 239, 243-244; *Hoffmann v Danielson*, 251 Wis 34; *Smith v First Provident Corp.*, 245 SC 509; cf. *Fifty States Mgt. Corp. v Pioneer Auto Parks*, 46 NY2d 573, 577, *supra*). In this instance, assuming that Tappan had been guilty of a breach of contract by failing to comply fully with some of the bona fide demands set forth in the July 18.letter within the 60-day limitation, the materiality of such breach was substantially diluted, if not negated, by virtue of Tappan's 20-year history of meeting its sales quota, Volvo's lack both of co-operation and interest during the 60-day period, and Tappan's efforts toward complying with such demands. Where time is not of the essence, failure to perform within the time limit does not permit a forfeiture (*Forgay v Plum*, 99 Cal App 524). Similarly, if time is not of the essence, mere delay in performance of a contract is not considered a material breach justifying a rescission (*Taylor v Goelet*, 208 NY 253; 17A CJS, Contracts, § 422[1]). As succinctly and aptly stated by the late Judge Cardozo in *Jacob & Youngs v Kent* (230 NY 239, 242, *supra*): "There will be no assumption of a purpose to visit venial faults with oppressive retribution." Finally, I believe the trial court justifiably voiced concern with respect to the potential harm that the general public might suffer from any termination of Tappan's franchise by Volvo. In enacting, *inter alia*,

section 197 of the General Business Law, the Legislature took into account that the sale of motor vehicles to the public creates a continuing obligation of the manufacturer, distributor and dealer to the buying public thereby affecting the public interest. The termination of such relationship by a manufacturer or distributor without good cause is deemed a denial of the rights of the general public to the availability of continuing postsale mechanical and operational service and a preclusion of the relationship expected between the buyer and seller necessary to insure the safe operating conditions of the vehicle. Consistent with the above, I conclude that implicit in a manufacturer's or distributor's obligation to show good cause for terminating a dealership, is a related burden of demonstrating that such severance would not result in great inconvenience and hardship to the vast number of persons who have purchased the manufacturer's vehicles from the targeted dealer over the years and have had them serviced continually at the latter's place of business. In the case at bar no evidence was adduced by Volvo to show that owners of Volvos who purchased their vehicles at Tappan over a span of two decades and had them serviced there, had adequate and accessible alternatives for service and maintenance at other Volvo dealerships in the Westchester and/or metropolitan area.