**BRONX AUTO MALL, INC., d/b/a Bronx Acura, Plaintiff,**

v.

**AMERICAN HONDA MOTOR .CO., INC., Defendant.**

**No. 96 Civ. 1099 (LAK).**

United States District Court, S.D. New York.

July 26, 1996.

---

Thomas ·C. Moore, ·Mark Mendelsohn, Proskauer Rose Goetz & Mendelsohn, New York City, for Plaintiff.

Robert L. Weigel, Boyd M. Johnson, III, Sue Nam, Lawrence J. La Sala, Gibson, Dunn & Crutcher, L.L.P., New York City, for Defendant.

## OPINION

KAPLAN, District Judge.

Plaintiff Bronx Auto Mall, Inc. d/b/a Bronx Acura ("Bronx Acura"), seeks to enjoin defendant American Honda Motor Co. ("AHMC"), U.S. distributor of Acura automobiles, from terminating Bronx Acura's dealership. Bronx Acura claims that AHMC decided that it established too many dealerships when it first introduced the Acura into the U.S. market, that it no longer wishes to have a dealer in the Bronx, and that it made unreasonable demands on Bronx Acura in order to· establish a pretext for terminating· its franchise. AHMC responds that Harold Schlanger, the principal of Bronx Acura, has decided to leave the business in the foreseeable future, that he stubbornly refused to comply with reasonable requests for facilities

maintenance and improvement in order to maximize his cash flow, that Bronx Acura's facilities no longer remotely approach standards reasonably set by AHMC for its Acura dealers, and that AHMC therefore was entirely justified in terminating the franchise. Perhaps not surprisingly, there is a certain amount of truth on both sides. This is the Court's decision after an expedited bench trial.

### Facts

*Introduction of Acura into the United States*

AHMC introduced its Acura line of automobiles into the United States market in 1986 in an effort to open a "second channel," *i.e.*, a line of luxury automobiles. In order to do so, it was necessary to establish a nationwide network of dealers to sell and service Acuras. It entrusted the task of developing this network to Daniel G. Crowe, who remained in charge of AHMC's Acura market representation activities through the time of trial and who previously had similar responsibilities in AHMC's Honda division. (Tr. 105–06; DX 1, ¶ 1)

Hondas and Acuras are priced differently. The former is targeted at cost-conscious consumers while the latter is in the luxury or near-luxury segment of the market. In consequence, the locations in which one might wish to have Honda dealerships do not necessarily correspond to those one might regard as appropriate for Acura dealerships. AHMC, however, did not have market data pertinent to selecting locations for Acura dealerships. Nevertheless, it was in a hurry to establish a market presence for Acura. Mr. Crowe was given a target of opening 600 dealerships. (Tr. 113) In view of the time pressure under which he was operating, he used the data that AHMC had used in making market representation decisions for Honda automobiles to determine where to locate Acura dealerships. He adopted as a rule of thumb the goal of locating six Acura dealers in each area in which AHMC had nine Honda dealers. (*Id.* 107–12) As Mr. Crowe admitted at trial, this resulted in opening Acura dealers in markets that were less than ideal for that product. (*Id.* 113) Moreover, although AHMC had a facility planning guide

for assessing proposed dealer facilities, those guidelines were ignored, at least on occasion, in AHMC's haste to penetrate the market. In addition, its haste led it to give preference in awarding franchises to known quantities— dealers who, like Mr. Schlanger, already had Honda franchises. (*Id.* 107)

*AHMC's Decision to Franchise Mr. Schlanger*

The Schlanger family has been in the automobile business in the Bronx for almost 50 years. Mr. Schlanger's father began selling used cars in the Bronx after the Second World War. In time, Mr. Schlanger and his brother, Martin, went into the family business. In 1963, Martin Schlanger obtained Volvo and Saab new car franchises while Harold Schlanger ran the used car business. Harold obtained a Mazda franchise in 1973 at about the same time that Martin obtained a Honda franchise in Manhattan, at which point it appears that the two brothers went their separate ways. In 1975, Harold obtained a Honda franchise in the Bronx. In time, he acquired Hyundai, Volvo, Buick, Chevrolet, and Suzuki franchises as well.

Shortly after AHMC introduced the Acura into the U.S. market, Mr. Schlanger decided to add an Acura dealership to his collection and applied for a franchise. In order to understand the present controversy, it is important to focus on what Mr. Schlanger's facilities were at the time he opened discussions with AHMC and what he proposed to do in order to obtain an Acura franchise. Particularly salient is the arrangement of the parts and service areas in relation both to one another and to the Acura showroom.

At the time Mr. Schlanger approached AHMC with regard to Acura, many of his operations were located in premises at 2633 through 2641 East Tremont Avenue in the Bronx, which are the buildings at the heart of this case. As the following diagram shows, all of the Honda facilities were in 2641, which were leased premises. The Hyundai sales and service facilities were in 2633 and 2637. The Mazda, Volvo and Buick service departments were in 2639. There was a large parking lot, with frontage on East Tremont Avenue and facing Silver Street, adjacent to 2633.

Mr. Schlanger proposed to build an entirely new showroom for Acuras on the site of the parking lot adjacent to the Hyundai showroom and to dedicate the service and parts facility at 2637 East Tremont Avenue, previously used for Hyundai service, exclusively to the service and parts departments of the proposed Acura dealership.[1] Thus, as the diagram shows, Mr. Schlanger proposed an arrangement in which an Acura customer seeking service would have to drive through a narrow passageway squeezed between two other buildings to reach the service area. The parts department would be accessible only by walking through the repair shop.

AHMC inspected the proposed parts and service facilities in or about January 1987. Tom Daly, then an Acura district sales manager, completed a form entitled "site plan summary" which is notable for several reasons. First, Mr. Daly wrote on the form that parts would "have to be delivered into [the] service dept." Second, he circled the word "none" next to an item that reads "influence of Facility Planning Guide." Third, he wrote that the area of the proposed parts department, which already was in existence and has not changed during the relevant period, was 3,797 square feet—a figure above the AHMC guideline area, but which far exceeds the actual area of the parts department.[2] (PX 1 at AH 0542; see Tr. 60)

Mr. Daly's report was not the only source of AHMC's knowledge of the proposed service and parts facilities. The file contains also a proposed site evaluation, dated June 22, 1987, which was filled out by William

---

1. Mr. Schlanger signed an application form for the Acura franchise on August 20, 1986. (PX 1, AH 0543–50) The form contained a page upon which the applicant was to provide information regarding its proposed facilities, but Mr. Schlanger left that page blank, save that someone had typed in AHMC's square footage guidelines for different categories of space usage. (Id.; AH0549) The Court finds that the initial communications regarding facilities were verbal.

2. The Court attributes Mr. Daly's inaccuracy with respect to the area of the parts department to the pressure that AHMC's Acura division was under to sign up dealers. (See also Tr. 60–67)

Lundy, then a district sales manager and now the Acura zone sales manager for the northeast region, which includes the Bronx,[3] and approved by Mr. Crowe on July 21, 1987. (PX 2 at AH0606–27) The evaluation explicitly stated that parts and service would be at the then-existing Hyundai parts and service location at 2637 East Tremont Avenue. The document, moreover, contained a number of photographs of the building, its interior, the neighborhood, and other points of interest. Among the photographs was a picture of the service area and the parts counter with the label "parts department behind this wall and counter window." (*Id.* AH0618) Thus, it was perfectly obvious from Mr. Lundy's site evaluation that the only access to the parts counter would be through the service area. (*See* Tr. 60–67, 94–95) As Mr. Lundy indicated at trial, he left Mr. Schlanger with the clear impression that the facility was entirely acceptable to Acura subject to some purely cosmetic work.[4] (Tr. 320–21; *see also id.* 94–95)

The application file contains also a brief evaluation of the market dated July 19, 1987. It stated, among other things:

"It is unlikely that the income levels in the Bronx will increase greatly, which would force the dealer to attract more consumers from the surrounding market areas. People are not willing to travel to the Bronx because of its reputation for crime and drugs. There should be enough people working their [*sic*] however to purchase the upscale model lines. But to say people from the surrounding markets would travel to the Bronx to buy $25,000 to $30,000 automobiles would be stretching it." (PX 2 at AH0604)

Mr. Crowe noted his approval, subject to construction of the proposed new showroom, immediately below this typewritten paragraph.

AHMC definitively approved the issuance of the franchise to Mr. Schlanger in August 1987. As the foregoing shows, it granted the franchise despite its knowledge that the service and parts facilities would be substandard and that the dealership would be located in an area of dubious attractiveness. The Court finds that it did so in order to meet the 600 dealer goal that Mr. Crowe's superiors imposed upon him.

*The New and Modified Bronx Acura Facilities*

Following AHMC's approval, Mr. Schlanger built the promised Acura showroom, relocated certain of his other car lines to make way for Acura, and made the promised cosmetic changes to the service and parts departments at an overall cost in excess of $500,000. (Tr. 72, 96) Upon completion, the layout of the East Tremont Avenue location was as shown below:

---

**3.** Mr. Lundy then was the district sales manager for New York City. (DX 2, ¶ 1)

**4.** Mr. Schlanger advised AHMC: "Our Service and Parts departments will be located at 2637 E. Tremont Ave. This existing facility has recently been vacated. We plan to refinish this entire facility by painting the exterior and interior walls with Acura colors, refinishing the floor and improving the floor surface and appearance. We will make the Parts Department more appealing and will provide an area in one of our other facilities for bulk storage as needed. These renovations will cost approximately $25,000 to $30,000." (PX 2 at AH 0603) Even if this letter were regarded as ambiguous with respect to the purely cosmetic nature of the improvements Mr. Schlanger promised for the service and parts areas, which it is not, the ambiguity would have been removed by the cost figures. The cost of the new showroom was at least $50 per square foot (PX B, ¶ 9 (showroom cost $250,000); PX 5 (showroom 5,000 square feet)), whereas the $25,000 to $30,000 mentioned as the cost of the improvements to the service and parts areas worked out to $2.50 to $3.00 per square foot (*see* Tr. 57) (building area 10,000 square feet), obviously demonstrating that no substantial changes were to be made.

SILVER STREET

SHELL SERVICE STATION

TO 2541-43

MAZDA & VOLVO SHOWROOM

INTERIOR OFFICES

PARKING LOT

EAST TREMONT AVE.

2621

HYUNDAI SHOWROOM

2633

SITE: AS OF MID 1988

2639

MAZDA, VOLVO, BUICK SERVICE

2641

HONDA SHOWROOM, SERVICE & USED CARS

*The Change in Acura's Strategy*

Mr. Crowe never came close to signing up 600 Acura dealers. In February 1988, AHMC evidently reached the conclusion that its strategy for adding dealers had been a mistake. It imposed a moratorium on issuing new franchises. (Tr. 114) It peaked with 301 Acura dealers in 1989,[5] just when its nationwide unit sales also peaked at 142,100 vehicles. (PX 76) For years thereafter, car sales by the Acura division were in a steady downward trend, with unit volume falling to 108,200 in 1993, a 23.9 percent decline.[6] (*Id.*)

This decline had a dramatic impact on Acura dealers. The average number of vehicles sold per dealer fell from 506 in 1987 to 375 in 1993. The proportion of dealers who

were losing money rose to almost 60 percent before falling back into the 40 to 50 percent range. The number engaged in "dualing"— handling other new car lines—rose, to AHMC's distress. (PX 76; Tr. 137, 160) Acura dropped to 25th among U.S. car lines in the level of dealer satisfaction.[7] (Tr. 152–54) The message to AHMC was clear—there were too many dealers chasing too few customers. Hence, although the moratorium on issuing new franchises formally was lifted in 1991, AHMC has issued only two since then. (Tr. 114–15) The trend has been in the other direction, with the dealer count dropping to 291 in 1992 and 283 in 1994. (PX 76)

In 1993, AHMC appointed Richard Thomas as the new head of the Acura division in an effort to turn it around. (Tr. 274) Al-

5. There was a small increase in the number of dealers in 1989 as compared with 1988. The Court infers from the long interval between the approval of the Bronx Acura franchise and its opening for business that the increase from 1988 to 1989, after the imposition of the moratorium, was the result of dealers which had been approved before the moratorium actually beginning operations.

6. The downtrend to some degree has been reversed recently. (Tr. 100)

7. Recently, some dealers even refused to accept new cars for sale unless AHMC improved its sales support. (Tr. 152–54)

though the date at which the process began is not clear, AHMC concedes detailed analysis of cutting the number of dealers, already a foregone conclusion, got into full swing on Thomas' watch. In the second half of 1994, the Acura division began Project 99, which specifically looked at reducing the number of dealers. (*E.g.*, Tr. 255, 276) Project 99 in turn gave way to an outside study, called the Fast Track Program, which still is underway and which is looking at ways to reduce the number of dealers and eliminate dualed franchises, among other means of improving Acura's performance. (*E.g.*, Tr. 154–62, 257; PX 101)

AHMC argues that neither Project 99 nor the Fast Track Program had reached any conclusions by the time Bronx Acura was terminated and that the decision to terminate Bronx Acura was unrelated to dealer cutbacks. The Court accepts that no definitive conclusions had been reached by the time of trial as to the optimum number or locations of Acura dealers. Nevertheless, the Court does not fully credit the testimony of the AHMC witnesses on this point. It finds that the Acura division stopped adding new dealers and, by the time of the events in question here, had decided to eliminate dealers, especially dual dealers and dealers in less desirable locations, whenever possible. (*See, e.g.,* Tr. 161–62, 175–76) AHMC, moreover, was very conscious of the potential limitations imposed by state franchise laws on its ability to eliminate dealers. (*Id.* 157) Hence, the mindset was an opportunistic one: if a less than desirable dealer could be portrayed as having given grounds for termination unrelated to a naked desire to cut the number of Acura dealers, AHMC was very much interested in taking advantage of the situation.

*Bronx Acura's Relationship with Acura— 1987 to 1994*

Bronx Acura's history with AHMC paralleled the Acura division's performance. Initially, it was very successful. In 1989, AHMC renewed the franchise to run until January 31, 1994. AHMC did not request any facilities upgrades at the time of the renewal. But amity was not to prevail. As time went by, Bronx Acura's initial success turned into a declining sales trend, a decline even steeper than that experienced by the Acura division. (DX 12, at 51; DX 2, ¶ 5) Other irritants came to the fore as well.

*Price Cutting*

Perhaps spurred by Acura's declining popularity and its own less than ideal location, Bronx Acura competed aggressively. As Mr. Lundy foresaw before the franchise was issued, it sought to attract customers from outside the Bronx. In 1991 and 1992, Acura division zone personnel admonished it for "distress" pricing and advertising—*i.e.*, price cutting or making price a focus of competition—on several occasions. (PX 21, PX 23, PX 29, DX 50, DX 55; *see also* Tr. 307–11; PX B, ¶¶ 26–27) The dealership was known to be selling a majority of its new vehicles to customers outside its primary market area (Tr. 311–12)—in other words, it was competing hard with surrounding Acura dealers, a matter that the Acura division watches closely. (*Id.* 182–83)

*Initial Facilities Issues*

In view of the current controversy, one might expect that Bronx Acura's facilities, never ideal from AHMC's point of view, would have been an issue as well. But they were not, at least to any substantial extent. To be sure, Acura division personnel, who visited the facility regularly, complained on a number of occasions about the cleanliness of the showroom and restrooms. (PX 28 at AH1428, PX 29, DX 39, DX 51, DX 53, DX 55) A majority of the contact reports that they routinely prepared following such visits, however, made no adverse comments about the facilities. (PX 15, PX 23, PX 24, PX 31, PX 37, DX 36, DX 50, DX 52, DX 63). Indeed, a facility audit conducted in June 1990 rated the facilities overall as "good." (PX 27) But two events in the winter of 1993–94 combined to place Bronx Acura's facilities at the eye of the storm.

The first was a roof leak. The Acura and Honda service areas, which are in adjacent premises at 2637 and 2641 East Tremont Avenue, are in older wood frame buildings with flat roofs. Beginning in the fall of 1993, the roofs began to leak. Tiles in the dropped ceiling in the Acura area became wet and discolored, and water sometimes dripped into

the service area. A wooden beam supporting the roof in the Honda area at 2641 broke and was supported temporarily by an unsightly wooden structure placed on a hydraulic lift. Ms. Arcaro, the Acura district parts representative, as well as Mr. Brent and Mr. Szabatura, repeatedly complained to Mr. Schlanger and noted the condition in their contact reports. (PX 45, PX 54, DX 30, DX 31, DX 33, DX 34, DX 58, DX 63–DX 68) Repairs no doubt were difficult to make during the winter months, as Mr. Schlanger contended, but there is little doubt that he delayed making necessary repairs for many months, far beyond what was reasonable.

*The New Showroom Proposal Paves the Road to Termination*

The second event that led to the current state of affairs, ironically, was Mr. Schlanger's decision in 1993 to build a new Acura showroom at 2541 East Tremont Avenue, about a block away from the showroom he had built in 1989. He first discussed the idea with Mr. Lundy, who had become zone manager in July 1992, and then submitted a written proposal.[8] (*See* PX 44 at AH0084)

On February 12, 1994, Mr. Lundy, the AHMC official who initially expressed skepticism about the Bronx as a market for Acuras, forwarded the new showroom proposal to Mr. Crowe. (*Id.*). His view of the Bronx had not improved in the years since Mr. Schlanger first applied for an Acura franchise. (*See* Tr. 122) His transmittal memorandum read in relevant part:

> "This relocation does not affect Service and Parts, although those departments are substandard. Currently the Service Department heat is turned down because the showroom is vacant, the ceiling is caving in, and the customer waiting area has cardboard rather than carpeting. In addition, the financial statement is continually adjusted every quarter and includes another make. *The real issue is do we need a*

*dealer in this market. This is our opportunity to (pardon the pun) turn up the heat on this dealership, rather than to renew without any regard to Acura standards.*" (PX 44 at AH0080) (emphasis added)

And turn up the heat they did.

In short order, Mr. Crowe received details of alleged deficiencies in the service and parts departments at Bronx Acura.[9] Gregg Szabatura, the assistant zone manager for service in Bronx Acura's zone, sent Mr. Crowe a note on February 22, 1994, in which he stated that Mr. Schlanger had not invested anything in the facility, together with a sheaf of photographs of Bronx Acura. (PX 45) A few days later, he followed up with another memorandum listing alleged facilities deficiencies at Bronx Acura and Martin Manhattan Acura, which then was owned by Mr. Schlanger's brother. (DX 27)

Mr. Szabatura's photographs show some undesirable conditions at Bronx Acura. They depict, for example, the temporary roof repair which, to say the least, was unattractive. But it is important to note that the photographs of the shop area and parts department are indistinguishable in any material respect from those which were before Mr. Crowe when he approved Mr. Schlanger's franchise in 1987. (PX 45 at AH0078) The layout of both was unchanged.

*The Demand for Unspecified Renovations*

On March 23, 1994, Mr. Crowe approved Mr. Schlanger's proposal to relocate the showroom. (Plaintiff's facilities following completion of the new showroom are depicted in the Appendix.) But he limited the renewal of the Bronx Acura franchise to six months, expiring September 30, 1994, and coupled a further renewal to a complete renovation of the parts and service departments:

> "While we are pleased with the action you have taken to upgrade the Acura show-

---

8. It appears that the formal written proposal was not submitted until the new showroom either had been built or was under construction. The paperwork was catching up to reality. (Tr. 312) There is no suggestion by AHMC, however, that Bronx Acura did anything wrong in going ahead with the showroom prior to formal written approval.

9. Mr. Crowe claimed that Acura service and parts personnel solicited his help at this time in securing improvements at Bronx Acura. The Court finds, however, that the communications to Mr. Crowe were instigated by Mr. Lundy.

room, *you need to move forward immediately to completely renovate the Acura Parts & Service departments and customer lounge.* I understand the Zone Office has discussed this matter with you on many occasions. However, you have not taken any steps to correct the deplorable conditions your employees have worked in and the Acura customers are exposed to. *I have requested the Zone Office to schedule a meeting with you in the near future to develop renovation plans and a timetable to complete the remodel of these departments.*" (PX 48) (emphasis supplied)

Several points concerning this letter are remarkable. First, as far as Mr. Schlanger was concerned, it came out of the blue. Contrary to Mr. Crowe's statement, the zone office had not discussed renovation of the parts and service departments with Bronx Acura. Second, other than the problem with the leaking roof that developed in late 1993 and remained uncorrected as of the date of the letter, the only conditions of which the Acura division previously had complained were those noted above: occasional dirty conditions in the rest rooms and dust in the showroom. (PX B, ¶ 31) Thus, Mr. Schlanger had little idea of what Mr. Crowe was talking about. He said that he expected that he would hear from the zone office shortly and find out what was on Acura's mind. (*Id.* ¶ 33) But that was not to be.

No one from the zone office contacted Mr. Schlanger about the unspecified renovation that Mr. Crowe had demanded. In the ensuing months, Bill Brent, the district sales manager, and Ms. Arcaro, the district parts manager, paid their usual calls on Bronx Acura. They inquired about the roof repairs and, on occasion, routine maintenance items. But there was no mention of renovation. (*Id.* ¶ 34)

On May 13, 1994, Mr. Szabatura and Bob Pouster, the assistant zone manager for parts, visited Bronx Acura without Mr.

Schlanger's knowledge. (DX 18; PX B, ¶ 35) Ten days later, Mr. Szabatura denied a Bronx Acura request for an increase in the labor rate charged for warranty repairs because it had not yet "complied with" Mr. Crowe's March 23 demand for renovations. (*Id.*) As is readily apparent, Mr. Szabatura had no basis for taking this position. Mr. Crowe's letter had not specified what AHMC wanted done and had promised that Mr. Schlanger would be contacted by the zone to work that out, but the zone never had done so.

### The Demand for a Contract Addendum

As the September 30, 1994 expiration date of Bronx Acura's franchise agreement approached, Mr. Crowe decided that he would insist, as a condition of renewal, that Mr. Schlanger sign an addendum to his franchise agreement obligating him to make improvements that AHMC would demand.[10] He prepared a draft amendment and addendum to the contract and, on August 4, 1994, sent it to Messrs. Lundy, Szabatura and Pouster with a request that they make recommendations concerning the specific upgrades that AHMC would demand. (DX 23; DX 1, ¶ 27) Mr. Szabatura enlisted the help of Ms. Arcaro, who furnished him with her "wish list"—so denominated—a few days later. (DX 24) On August 11, 1994, Messrs. Szabatura and Pouster forwarded a proposed schedule of improvements (DX 19) which Mr. Crowe incorporated into his proposed addendum to the contract with only minor revisions (PX 59). (DX 1, ¶¶ 28–29)

The proposed addendum listed sixteen changes insisted upon in the service area and three in the parts department. Many were simple, cosmetic changes such as removing old parts from the shop area. Some, like the insistence that Bronx Acura purchase certain equipment for its Acura service department that it already had in its immediately adjacent Honda repair shop (Tr. 80–81), were more difficult to understand. But the crux of

---

10. The reason for such a demand is clear in light of the terms of the AHMC–Bronx Acura franchise agreement. Under the franchise agreement, a dealer could be terminated, as a contractual matter, for failing to make improvements of two kinds—(1) "reasonable" improvements and (2) improvements the dealer promised to make.

(DX 7, ¶ 9.4L) By obtaining Mr. Schlanger's agreement to make the renovations, AHMC would have been in a stronger position to terminate Bronx Acura if it failed to make the promised improvements because the reasonableness of the improvements would not be in issue. (*See* Tr. 126)

the problem was AHMC's insistence that Bronx Acura fundamentally change the layout of the parts and service departments to (1) eliminate customers' need to walk through the shop to reach the parts counter (PX 59, ¶¶ A.4, B.1), (2) construct a retail parts counter (*id.* ¶ B.1), (3) construct new rest rooms (*id.* ¶ A.15), and (4) establish a dedicated Acura customer waiting area. (*Id.* ¶ A.8) Mr. Schlanger testified, Mr. Crowe essentially admitted, and the Court finds, that the only feasible means of accomplishing all of these goals would have been to eliminate the used car showroom at 2633 East Tremont Avenue, thus depriving Mr. Schlanger of any frontage on East Tremont Street and of the showroom for his used car operation.[11] (Tr. 127–28; PX B, ¶¶ 45–49; *see id.* 313–14) Moreover, these demands were for substantial changes in the layout of a facility that AHMC had approved in 1987.

On September 8, 1994, Messrs. Lundy, Szabatura and Pouster met with Mr. Schlanger at Bronx Acura. This was the first contact by the zone office to follow up on Mr. Crowe's March 23 letter, and it came only twenty-two days before the expiration of the then-current renewal term on Bronx Acura's franchise agreement. The meeting was an awkward one. The AHMC representatives pressed Mr. Schlanger to sign, or at least commit to making the improvements listed in, the addendum, which was made a part of an amendment that would have extended the Bronx Acura franchise to June 30, 1995.[12] Mr. Schlanger just as studiously avoided making any commitment because he feared that any failure to comply with the precise letter of a commitment later would be used as a basis for terminating Bronx Acura. (Tr. 168; *see also* DX 25) Both parties understandably were dissatisfied at the end of the meeting.

*The Outbreak of Hostilities—1994 to 1996*

Mr. Schlanger expected that negotiations would ensue concerning AHMC's apparent desire for facilities improvements.[13] But at this point, although Mr. Schlanger did not know it, AHMC had no interest in negotiations. A September 28, 1994 memorandum by Mr. Crowe shows that Mr. Lundy by this time had flatly recommended that Bronx Acura be terminated. (PX 67 at AH9818; Tr. 119–20) The Court finds that Mr. Crowe was in agreement and had no intention of negotiating. The franchise agreement, as a contractual matter, expired by its terms on September 30, 1994. Nevertheless, the relationship continued by virtue of New York law. *See* N.Y.VEH. & TRAF.L. § 463, subd. 2(d)(1) (McKinney 1986).

On January 6, 1995, Mr. Crowe wrote to Mr. Schlanger. The letter purportedly recited the Acura division's alleged grievances regarding Bronx Acura's facilities. It renewed the franchise agreement for the period December 1, 1994 to October 31, 1995. It insisted that all improvements initially demanded in the proposed contract addendum be completed "to American Honda's satisfaction on or before July 15, 1995 ..." and notified Mr. Schlanger that these demands would be conditions, pursuant to Section 463, subd. 2(c) of the New York Vehicle & Traffic

---

**11.** AHMC sought to prove at trial that the used car showroom was unimportant to Mr. Schlanger because it was not intensively used and the used car operation lost money. Much of its argument rested on its interpretation of the Bronx Auto Mall, Inc., financial statements which, the Court finds, obscure more than they reveal and are an unreliable basis for determining the profitability of the used car business. (*See generally* Tr. 4–46) In view of Mr. Schlanger's testimony that the used car business is highly profitable and vital to his business (PX B, ¶¶ 47–51), coupled with his willingness to risk losing the Acura franchise rather than give up the used car showroom, the Court finds that the used car showroom was important to the business. It finds further that the AHMC personnel had, and knew they had, little basis for disputing the accuracy of Mr. Schlanger's assertions on this point.

**12.** Mr. Crowe testified that he viewed the addendum, at this point, as a list of items for negotiation. The Court does not credit that testimony. The list was a take-it-or-leave-it demand designed to "set up" Mr. Schlanger.

**13.** There were contacts between AHMC personnel and Mr. Schlanger on September 13 and October 12, 1994 during which Mr. Schlanger expressed a willingness to comply with most of AHMC's demands, but strongly resisted relocation of the parts department into the used car showroom. (DX 25; PX B, ¶ 55; PX 63) There was no movement on AHMC's part.

Law, to further renewal of the franchise. (PX 74) What was really going on, however, was revealed, in part, by a January 26, 1995 memorandum from Mr. Lundy, the zone manager, concerning his objectives for the year:

> "Close Bronx Acura—distress selling and poor market area causes dealer to sell outside of market." (PX 75; *see also* Tr. 305–07)

Contemporaneously, a document prepared in connection with Project 99 forecast that AHMC would reduce the number of Acura dealers to 240 in the year 2000.[14] (PX 76; Tr. 137–38)

It took a number of months for matters to reach the end. In May 1995, Mr. Brent again met with Mr. Schlanger to see what had been done and whether Mr. Schlanger's position had changed. Some of the items on AHMC's list had been completed to its satisfaction, some in a manner unsatisfactory to it. But the impasse over the parts department continued. (DX 26) With the October 1995 expiration date at hand, Mr. Crowe wrote to AHMC's executive committee, which formally approved his recommendation that Bronx Acura be terminated.[15] (PX 104; Tr. 196–97) On October 31, 1995, AHMC sent a formal notice of termination in order to comply with the New York Act. (PX 105) Subsequently, there were some further contacts between the parties. Mr. Schlanger spoke to Mr. Crowe and told him that he would make all of the changes requested save the reconfiguration of the parts and service departments. (PX B, ¶ 72) But Mr. Crowe had no interest in compromise.[16] (*Id.*) He later told Mr. Schlanger, "Harold, we just want you to go away." (*Id.* ¶ 73) So the parties ultimately found themselves before this Court.[17] The dealership has continued on a day-to-day basis pending the outcome. (*See* DX 1, ¶ 41)

### The Intentions of the Parties

The intentions of both parties are very much at the heart of this case, so it is important to summarize the Court's findings.

Mr. Schlanger, whether by force of circumstances or conviction, has a different philosophy of automobile sales than the Acura division. He competes on price and does not attach much importance to the attractiveness of the dealership facility or its amenities. (*See, e.g.*, PX B, ¶ 51) The condition of Bronx Acura—although exaggerated by AHMC—reflects that approach which, one must acknowledge, generally has been successful for Mr. Schlanger. Mr. Schlanger's aversion to investing in facilities has been enhanced in recent years by the fact that he now is in his fifties, has considered getting out of the business, and is disinclined to increase an investment that may well prove difficult to recoup except to the extent absolutely necessary. The Acura division, on the other hand, believes that Acura automobiles should be sold

14. By January 1996, AHMC proposed an accelerated timetable for eliminating dealers that would reach the 240 mark by the end of 1997. (Tr. 176–78, 161–62; PX 119) It expects to spend millions of dollars to buy out dealers. (*Id.*) Mr. Crowe, moreover, admitted that the money was for buying out unwanted dealers where AHMC "had no colorable grounds" to get rid of them. (Tr. 162)

15. The Court finds that the executive committee played no meaningful role in the termination decision, which was made by Mr. Crowe long before he made his "recommendation" to it. (*See* Tr. 196–97; DX 1, ¶¶ 2, 11) Its involvement in the process was designed to create the appearance that the ultimate decision, which ostensibly was made on a record articulating only facilities complaints, was made by persons who were insulated from the direct dealings with Bronx Acura. (*Cf.* Tr. 272) Although the point perhaps is not as important as it might have been had the executive committee played a real role in the decision, the Court notes that Mr. Crowe's memorandum to the executive committee contained misinformation. (Tr. 197–201, 205–08)

16. On December 7, 1995, Mr. Crowe sent Mr. Brent and Greg Norton to meet with Mr. Schlanger. In the course of the meeting, Mr. Schlanger again resisted giving up the used car showroom at 2633 East Tremont Avenue, but agreed that he could give up some space at the back of the building. In a memorandum dictated in the car on the way back from the meeting, Mr. Norton wrote that Mr. Schlanger had agreed to compromise. Mr. Crowe was not interested. (Tr. 133–36, 138–39, 286–92; PX B, ¶¶ 75–77; *see* Tr. 213–14)

17. The action was commenced in New York Supreme Court, Bronx County, and alleged claims under state law. AHMC removed to this Court.

at locations and from facilities likely to be convenient and appealing to the bulk of the customers who purchase cars in Acura's price bracket. Hence, there is little doubt that AHMC has been sincere in some of its complaints about facilities and. that Mr. Schlanger has not been as responsive as AHMC wished. In the last analysis, however, this case is not in this Court for that reason.

AHMC granted an Acura franchise to Mr. Schlanger (1) against the better judgment of Mr. Lundy, based on his view that the Bronx was not a desirable area for Acura sales, and (2) despite AHMC's awareness that the parts and service facilities did not approach what the Acura division wished to have. It did so because the market representation unit was under intense pressure to sign up dealers. It knew exactly what it was getting.

Bronx Acura, moreover, was a thorn in AHMC's side, primarily because it sold at cut-rate prices and attracted custom away from suburban dealers. While its facilities were not maintained as well as the Acura division might have expected, there were no major facilities issues before early 1994—after Mr. Lundy had taken over as zone manager and decided to take advantage of the new showroom proposal to try to get rid of a dealer that he did not want in the first place. Mr. Lundy's desire to terminate Bronx Acura fell on fertile soil when it reached Mr. Crowe because Mr. Crowe, by early 1994, was anxious to reduce the number of Acura dealers in line with Mr. Thomas' apparent view and the need for dealer reduction that already was evident. Indeed, Mr. Crowe had decided, albeit not formally, that Acura needed only three dealers in New York City, none of which would be in the Bronx. (Tr. 170–71)

As the foregoing suggests, there was room for disagreement about Bronx Acura's facilities. Any manufacturer or distributor has a legitimate interest in seeing to it that its dealers comply with reasonable requirements about cleanliness, regular maintenance and the like. Indeed, they have legitimate interests in seeking facilities upgrades in appropriate circumstances. Had there been a real willingness on AHMC's part to solve the problems, the parties would have reached a negotiated solution. In this case, however, AHMC had no interest in compromise. It decided to use its facilities complaints as a vehicle for terminating Bronx Acura. When it found the sticking point—Mr. Schlanger's unwillingness to expand and relocate the parts department and create a new customer lounge, which would have required elimination of his used car showroom—it had the weapon it was searching for. While Mr. Schlanger's refusal to make the improvements on Mr. Crowe's list was the stated basis for termination, the primary motives in fact were to (1) reduce the overall number of dealers, and (2) get rid of a dealer who cut prices. Whether AHMC had the right to terminate Bronx Acura in these circumstances is the fundamental legal question at issue here.

*Discussion*

Distribution through franchised dealers has a long history in the United States because it serves important purposes for manufacturers and other suppliers. The supplier greatly reduces the need to invest in distribution facilities because the investment comes in major part from the people who know their communities, who have strong incentives (including the investment of their own capital) to succeed, and who may operate more flexibly than perhaps is common in hierarchical sales organizations. With these advantages, however, come countervailing disadvantages. The supplier usually has less control over the activities of the dealers than it would if it used its own employees. The dealers ordinarily cannot simply be ordered to make additional investments. Some dealers may skimp on service and other product support activities, while others may compete harder against neighboring dealers in the supplier's branded products than against those who sell the products of the supplier's competitors. Hence, the history of franchised distribution in this century has seen a tug of war between franchisors seeking to exercise control over independent franchisees and franchisees fighting back through litigation and legislative activities.

At one time, the battle between franchisors and franchisees was waged primarily in the antitrust arena. *See, e.g., Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). But franchised dealers, especially in the automobile industry, have procured the enactment of legislation designed to protect them against the superior economic power of the franchisors. The New York Franchised Motor Vehicle Dealer Act, N.Y.VEH. & TRAF.L. §§ 461–71 (McKinney 1986 & Supp.1996) (the "New York Act"), and the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–25 (1988) ("ADDICA"), which are the bases for this suit, are prominent examples. *See also, e.g.,* 15 U.S.C. §§ 2801 *et seq.* (1988) (Petroleum Marketing Practices Act).

The New York Act, broadly speaking, prohibits automobile companies from, among other things, (i) seeking to coerce dealers into signing agreements or otherwise acting contrary to their economic interests (§ 463, subd. 2(b)), (ii) conditioning franchise renewals on substantial renovations or new construction by the dealer except in limited circumstances (*id.* subd. 2(c)), (iii) refusing to renew except for "due cause" and after proper notice (*id.* subd. 2(d)(1)), and (iv) imposing unreasonable restrictions on renewal or conditioning renewal on compliance with subjective standards (§ 466, subd. 1).[18] Bronx Acura claims that AHMC violated all of these provisions. It is necessary, however, to address principally the most specific of its provisions, Section 463, subd. 2(c), and the due cause requirement, Section 463, subd. 2(d)(1).

### The Renovation Demand

AHMC demanded that Bronx Acura, as a condition of renewal of its franchise, make all of the improvements listed in Mr. Crowe's proposed addendum to the franchise agreement and refused to renew when Mr. Schlanger did not do so. This action violated the New York Act if the improvements would have constituted "a ... substantial renovation of [Bronx Acura's] place of business" unless AHMC has (1) demonstrated "the need for such change in the place of business and the reasonableness of such demand in view of the need to service the public and the economic conditions existing in the automobile industry," and (2) agreed in writing "to supply [Bronx Acura] with an adequate supply of automobiles to meet the sales levels necessary to support the increased overhead incurred by the dealer by reason of such renovation ..." New York Act § 463, subd. 2(c).

The phrase "substantial renovation" refers, at a minimum, to the physical extent of the

---

**18.** Section 463, subd. 2, provides, in relevant part:

"It shall be unlawful for any franchisor:

"(b) To directly or indirectly coerce or attempt to coerce any franchised motor vehicle dealer to enter into any agreement with such franchisor ... or to do any other act prejudicial to the monetary interests or property rights of said dealer by threatening to cancel any unexpired contractual agreement existing between such franchisor and said dealer. Provided, however, that good faith notice to any franchised motor vehicle dealer of said dealer's violation of any terms or provisions of such franchise shall not constitute a violation of this article.

"(c) To condition renewal or extension of a franchise on a franchised motor vehicle dealer's substantial renovation of the dealer's place of business ... unless the franchisor has advised the franchised motor vehicle dealer in writing of its intent to impose such a condition within a reasonable time prior to the effective date of the proposed date of renewal or extension (but in no case less than one hundred eighty days) and provided the franchisor demonstrates the need for such change in the place of business and the reasonableness of such demand in view of the need to service the public and the economic conditions existing in the automobile industry at the time such action would be required of the franchised motor vehicle dealer. As part of any such condition the franchisor shall agree, in writing, to supply the dealer with an adequate supply of automobiles to meet the sales levels necessary to support the increased overhead incurred by the dealer by reason of such renovation ...

"(d)(1) To terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer except for due cause, regardless of the terms of the franchise...."

Section 466, subd. 1, provides in relevant part: "It shall be unlawful for a franchisor directly or indirectly to impose unreasonable restrictions on the franchised motor vehicle dealer relative to transfer, sale, right to renew or termination of a franchise, ... compliance with subjective standards and assertion of legal or equitable rights with respect to its franchise or dealership."

construction work required in relation to the dealer's premises. Read more broadly, it comfortably could comprehend the impact of the changes on the dealer's business as well as the physical plant. The New York Act and its counterparts in other states [19] do not define the term, and the Court has found no decisions that directly construe it in any relevant context. Hence, the Court must turn to the purpose of the statute in an effort to divine the intent of the Legislature. N.Y. Statutes §§ 92, 95, 96 (McKinney 1971).

■ Section 460 of the New York Act declares that the Legislature found that this statute was necessary "to prevent ... impositions and other abuses upon ... citizens and to protect and preserve the investments and properties of the citizens of this state." The memorandum in support of the bill that included Section 463, subd. 2(c), pointed to the "great disparity in bargaining power between the motor vehicle manufacturer and the motor vehicle dealer" and stated that it sought to provide "certain basic protection" for "the motor vehicle dealer who frequently has millions of dollars invested in dealership real property, equipment and good will [but] can do nothing to oppose the will of the manufacturer without jeopardizing this substantial investment." Memorandum in Support of Legislation, *reprinted in* Governor's Bill Jacket, 1983 N.Y.Laws ch. 815. The manifest purpose to protect the dealer's investment suggests that a court must look at the impact of required renovations on the dealer's overall business. Accordingly, the Court concludes that determination whether particular renovations demanded by an automobile company subject to the New York Act are "substantial" must have regard both to the extent of the proposed physical changes and the impact of those changes on the dealer's business.

■ Many of the changes sought by AHMC, considered individually, did not rise to the level of substantial renovations. But the insistence on expanding and relocating the parts department, adding a dedicated lounge for Acura service customers, and renovating the restrooms did. These changes would have necessitated extensive construction, including the removal of existing walls and the installation of new restroom plumbing. Moreover, the impact on Mr. Schlanger's used car business would have been significant, as he would have lost the only used car sales space that either was indoors or had frontage on East Tremont Avenue.[20]

AHMC, the Court finds, did not demonstrate the need for these changes or the reasonableness of this demand "in view of the need to service the public and the economic conditions existing in the automobile industry." The layout of the parts and service departments was perfectly acceptable to AHMC when it first entered into the franchise agreement with Mr. Schlanger. AHMC made no showing that its original judgment was erroneous or that circumstances had changed. Its effort to show that more space was required for parts was unsuccessful. Although the Court agrees that the presence of Acuras in the market for a number of years, which was not the case in 1987, creates a greater potential for a dealer to require a larger number of different parts in its service operations, there simply was no persuasive evidence that Bronx Acura did not stock an inventory adequate for acceptable levels of customer service. Moreover, AHMC's demand was unreasonable, bearing in mind its initial approval of this facility and the declining fortunes of the Acura division in general. While AHMC has every right to seek to upgrade its dealers in an effort to bolster its performance, it did not have the unconstrained right to demand that this dealer, already suffering from poor sales, provide the capital for this particular upgrade against the history of its relationship with AHMC.[21]

---

**19.** La.Rev.Stat.Ann. § 32:1254(M) (West 1996); Wash.Rev.Code Ann. § 46.94.020(6) (West 1996).

**20.** The Court recognizes that the used car business was not conducted in the showroom before 1994. Nevertheless, the Court credits Mr. Schlanger's assessment of the importance of the showroom.

**21.** AHMC's letter to Bronx Acura recited, in the words of the statute, that it would supply the dealer with an adequate supply of automobiles "to meet the sales levels necessary to support the increased overhead" attributable to the renovation. (PX 74) As the Court has found that AHMC's demand was unreasonable and that the need for it was not demonstrated, there is no

In view of these considerations, the Court holds that AHMC's action in conditioning renewal of Bronx Acura's franchise on making all of the renovations on Mr. Crowe's list, which included the substantial renovations described above, violated Section 463, subd. 2(c), of the New York Act. It is important, however, to emphasize the narrow scope of this conclusion. As indicated, there has been no claim that many of the other changes sought by AHMC were "substantial renovations." AHMC has run afoul of this branch of the statute only by virtue of its all-or-nothing insistence on the entire list, which of course was a product of the fact that the demand for renovations was first and foremost a pretext for getting rid of Bronx Acura.

*Other Facilities Issues*

The Court's determination that AHMC violated Section 463, subd. 2(c), of the New York Act by demanding the changes in the parts department and rest rooms and the creation of a dedicated customer lounge does not answer every question raised on this record.[22] For one thing, that determination takes as its starting point AHMC's stated ground for non-renewal of the franchise, which the Court has found was not the principal motive for AHMC's action. Hence, the issue arises whether the non-renewal can be justified on other grounds—in particular, AHMC's view that it had too many dealers, no longer wanted to be in the Bronx, and wished to eliminate a dealer prone to aggressive intrabrand price competition. Similarly, the question remains whether AHMC's action may be supported by Bronx Acura's failure to make the improvements that did not amount to "substantial renovations."

■ The first issue—whether AHMC's action, if openly taken for the reasons that primarily motivated it, would have been legal—raises an interesting problem,[23] but one that is academic in the current posture of this case. Section 463, subd. 2(d)(1), of the New York Act prevents the expiration of a dealer franchise unless 90 days have elapsed following written notice by the supplier of its intention not to renew. The notice must state "the specific grounds for such ... refusal to renew." Inasmuch as the notice relied upon by AHMC (PX 105) did not state the principal reasons for AHMC's decisions, the non-renewal cannot be justified on those grounds even if they would have supported the termination had they been adduced. This conclusion is supported by decisions in

---

need to consider whether this recital otherwise would have saved AHMC's action. When demand for a make of automobile exceeds supply, the dealer's problem usually is getting sufficient cars to sell. An added allocation is almost as good as cash. That doubtless is what the Legislature had in mind when it drafted Section 463, subd. 2(c). Here, however, neither AHMC nor the dealers could sell all the Acuras that were available for sale. An additional allocation in such circumstances would be of no assistance to a dealer in recouping the increased overhead attributable to a renovation. It is questionable whether the Legislature intended to permit automobile companies to force even necessary and reasonable renovations on dealers in such circumstances.

**22.** Of course, to the extent AHMC violated Section 463, subd. 2(c), it violated also Section 466 because it unreasonably restricted renewal of the franchise.

**23.** The question whether a franchisor may terminate or decline to renew a franchisee for the franchisor's own business reasons, as distinguished from some failing by the franchisee, appears never to have been decided under the New York Act. Cases decided under other dealer protection statutes have reached inconsistent results. Compare *Petereit v. S.B. Thomas, Inc.,* 63 F.3d 1169, 1184 (2d Cir.1995) (Connecticut Franchise Act), *cert. denied,* —— U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996); *Amoco Oil Co. v. Dickson,* 378 Mass. 44, 46–47, 389 N.E.2d 406, 408 (1979) (Massachusetts law) (franchisor's reasons alone sufficient), *with Wright–Moore Corp. v. Ricoh Corp.,* 908 F.2d 128, 137 (7th Cir.1990) (Indiana Franchise statute); *Solman Distrib., Inc. v. Brown–Forman Corp.,* 888 F.2d 170, 173 (1st Cir.1989) (Maine statute); *Kealey Pharmacy & Home Care Serv., Inc. v. Walgreen Co.,* 539 F.Supp. 1357, 1365 (W.D.Wis.1982), *aff'd in part and vacated in part,* 761 F.2d 345 (7th Cir.1985) (Wisconsin Fair Dealership Law); *General Motors Corp. v. Gallo GMC Truck Sales, Inc.,* 711 F.Supp. 810, 816 (D.N.J.1989) (New Jersey Franchise Act); *Aurigemma v. Arco Petroleum Prods. Co.,* 698 F.Supp. 1035, 1042 (D.Conn.1988) (Connecticut); *Carlos v. Philips Bus. Sys., Inc.,* 556 F.Supp. 769, 776 (E.D.N.Y.), *aff'd mem.,* 742 F.2d 1432 (2d Cir.1983) (New Jersey statute); *Dr. Pepper Bottling Co. v. Frantz,* 311 Ark. 136, 145, 842 S.W.2d 37, 42 (1992); *General Motors Corp. v. Kinlaw,* 78 N.C.App. 521, 524, 338 S.E.2d 114, 117 (Ct.App.1985) (requiring franchisee failing).

other jurisdictions, which have held that franchisors may defend dealer terminations and non-renewals only on the grounds set forth in their notices. *See, e.g., American Isuzu Motors, Inc. v. New Motor Vehicle Board,* 186 Cal.App.3d 464, 476, 230 Cal. Rptr. 769, 776 (1986) (California automobile dealer franchise act); *Midwest Petroleum Co. v. American Petrofina, Inc.,* 603 F.Supp. 1099, 1123–24 (E.D.Mo.1985) (Petroleum Marketing Practices Act); *Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 237, 246 n. 19 (D.N.J.1976) (New Jersey Franchise Practices Act).

■ The second issue—whether Bronx Acura's failure to make the changes that fell short of "substantial renovations" constituted an appropriate basis for non-renewal—is raised by the notice. It poses the question whether the New York Act should be construed to permit an automobile company possessed of sufficient grounds for non-renewal to rely on those grounds despite the fact that those grounds are not the real motivation for its actions.

Section 463, subd. 2(d)(1) of the Act forbids termination or non-renewal in the absence of "due cause." The term "due cause" is not defined anywhere in the Act. However, in reviewing a franchise termination under a predecessor of the Act, former Section 197 of the General Business Law, the Second Department held that a proscription of terminations except for "cause" precluded an automobile company from terminating a dealer "either in bad faith or in the absence of good cause shown..." *Tappan Motors, Inc. v. Volvo of America Corp.,* 85 A.D.2d 624, 625, 444 N.Y.S.2d 938, 940 (2d Dept.1981), *appeal dismissed,* 56 N.Y.2d 632, 450 N.Y.S.2d 483, 435 N.E.2d 1098 (1982), *aff'd,* 64 N.Y.2d 1116, 490 N.Y.S.2d 168, 479 N.E.2d 804 (1985). The legislative history makes clear that requirement of "due cause" in the current Act is at least as demanding as the *Tappan Motors* definition of "cause."

■ Former Section 197 of the General Business Law was enacted in 1956. 1956

N.Y.Laws ch. 900. In 1983, the Legislature enacted the Act, but anomalously left Section 197 in place. In 1988, it repealed the General Business Law provision, 1988 N.Y.Laws ch. 64, on the basis that it was duplicative of the Act. Memorandum in Support of Legislation, *reprinted in* Governor's Bill Jacket, 1988 N.Y.Laws ch. 64. Indeed, the memorandum in support specifically stated that the Act "prohibits unfair business practices of motor vehicle franchisors, *including those practices prohibited by Article 11–A of the General Business Law.*" (Emphasis supplied) Thus, several years after the decision in *Tappan Motors,* the Legislature made clear its view that the protection accorded franchised dealers under the Act is at least as broad as that previously available under the General Business Law. In consequence, this Court holds that the Act's requirement of "due cause" is not satisfied unless the franchisor both has good cause and acts in good faith. *See also, e.g., Kawasaki Shop of Aurora, Inc. v. Kawasaki Motors Corp., U.S.A.,* 188 Ill.App.3d 664, 674, 136 Ill.Dec. 4, 10, 544 N.E.2d 457, 463 (Ct.App.1989); *Ri-Joyce, Inc. v. New Motor Vehicle Board (Mazda Motors of America, Inc.),* 2 Cal. App.4th 445, 457, 3 Cal.Rptr.2d 546, 553 (Ct. App.1992); *Carolina Truck & Body Co. v. General Motors Corp.,* 102 N.C.App. 262, 268, 402 S.E.2d 135, 138 (Ct.App.), *cert. denied,* 329 N.C. 266, 407 S.E.2d 831 (1991); *Sider v. Outboard Marine Corp.,* 160 Ill. App.3d 290, 298–99, 112 Ill.Dec. 35, 40, 513 N.E.2d 449, 454 (Ct.App.1987), *appeal denied,* 119 Ill.2d 575, 119 Ill.Dec. 398, 522 N.E.2d 1257 (1988) (table) (all holding franchisor to requirement of good faith by virtue of implied covenant of good faith and fair dealing, statute, or both).

The Uniform Commercial Code, which probably applies to this franchise relationship of its own force,[24] at least sheds light on the meaning of "good faith." It defines the term to mean "honesty in fact in the conduct or transaction concerned." N.Y.Unif.Comm. Code § 1–201(19) (McKinney 1993). There

---

**24.** *See* New York Act § 470 ("The provisions of this article shall be in addition to and not in lieu of those contained in the uniform commercial code."); *see also Zapatha v. Dairy Mart, Inc.,* 381

Mass. 284, 291, 408 N.E.2d 1370, 1375 (1980) (UCC good faith requirement applies to franchise agreement).

is no reason not to apply that common sense definition in this case. *See Carolina Truck & Body Co.*, 102 N.C.App. at 268, 402 S.E.2d at 138.

Here, AHMC's primary motives for non-renewal were business reasons internal to AHMC, although it also had some basis for dissatisfaction with Bronx Acura. Rather than put its cards face up on the table, it used complaints regarding Bronx Acura's facilities, some manifestly unreasonable and some at least arguably reasonable, as a pretext to get rid of a dealer it did not want for quite different reasons. This behavior did not conform to the standard of honesty in fact in the conduct or transaction concerned. Accordingly, this Court holds that AHMC did not act in good faith and, in consequence, that it lacked "due cause" under Section 463, subd. 2(d)(1), of the New York Act.[25] In doing so, the Court expresses no opinion as to whether the reasons for which AHMC acted, had they been openly and honestly relied upon, would have sufficed.

*Relief*

■ AHMC argues that plaintiff is not entitled to injunctive relief. It points to the fact that Acura is only one of the auto models sold by Bronx Auto Mall, Inc. and argues that courts have held that the termination of a line of products sold to a multi-line dealer does not threaten irreparable injury unless the line is so important to the dealer that its continued viability would be at risk absent a continuing source of the line in question.

To begin with, AHMC ignores Section 469 of the New York Act, which provides that "[a] franchised motor vehicle dealer who is or may be aggrieved by a violation of this article shall be entitled to sue for, *and have, injunctive relief* and damages ..." (Emphasis added) The statute thus appears to reflect a legislative determination that a franchised dealer threatened with non-renewal does not have adequate legal remedies and is faced with the risk of irreparable injury.[26] *Cf. SEC v. Kalvex, Inc.*, 425 F.Supp. 310, 316 (S.D.N.Y.1975) (SEC need not show irreparable injury to obtain injunction under statute entitling it to such relief "upon a proper showing").

In any case, plaintiff would be entitled to an injunction irrespective of the New York Act. It frequently is said, of course, that an applicant for an injunction must demonstrate a threat of irreparable injury and the inadequacy of legal remedies. *E.g., New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *but see, e.g., Koniag, Inc. v. Koncor Forest Resource*, 39 F.3d 991, 1000 n. 9 (9th Cir.1994) (inadequacy of legal remedies warrants injunction even absent

---

**25.** In *Major Oldsmobile, Inc. v. General Motors Corp.*, No. 93 Civ. 2189 (SWK), 1995 WL 326475, at * 8 (S.D.N.Y. May 31, 1995), *aff'd by summary order*, No. 95–7595, 1996 WL 280452, at * 3 (2d Cir. May 17, 1996), a Magistrate Judge of this Court held that the real motives of a franchisor governed by the Act are immaterial as long as there are legally sufficient grounds for termination. In doing so, she relied upon *Refinemet Int'l Co. v. Eastbourne N.V.*, 815 F.Supp. 738, 742 (S.D.N.Y.1993), *aff'd* 25 F.3d 105 (2d Cir. 1995) and similar cases, all save one of which dealt with the issue as a matter of conventional contract law, a context in which the proposition is unexceptionable.

The contract cases are not persuasive. The "due cause" requirement of Section 463, subd. 2(d)(1), of the New York Act expressly supercedes the contract between the parties. (Unlawful to terminate "except for due cause, regardless of the terms of the franchise.") As AHMC's failure to act in good faith requires the conclusion that it lacked "due cause" within the meaning of the statute, its action was improper even if a differ-

ent result would obtain were the issue to be decided purely as a matter of private contract law. The Court notes also that the Second Circuit's summary affirmance of *Major Oldsmobile* is not binding here because the rules of that Court specifically provide that summary orders lack precedential effect. 2d Cir.R. § 0.23.

*Two Wheel Corp. v. American Honda Corp.*, 506 F.Supp. 806 (E.D.N.Y.), *aff'd*, 633 F.2d 206 (2d Cir.1980) (table), the other case cited in *Major Oldsmobile*, was decided under Section 197 of the General Business Law. Nevertheless, its comments on the subject were dicta. The case, in any event, antedated *Tappan Motors*. This Court does not find it persuasive authority for the conclusion reached in *Major Oldsmobile*.

**26.** *Maier–Schule GMC, Inc. v. General Motors Corp.*, 850 F.Supp. 1095 (W.D.N.Y.1994), and *Sherwood Ford, Inc. v. Ford Motor Co.*, 875 F.Supp. 590 (E.D.Mo.1995), relied upon by AHMC, are not to the contrary. *Sherwood* did not involve the New York Act at all. *Maier–Schule* did not address the language of the New York Act quoted in the text.

threat of irreparable injury); *Crane by Crane v. Indiana High School Athletic Association*, 975 F.2d 1315, 1326 (7th Cir.1992) (same); *Lewis v. S.S. Baune*, 534 F.2d 1115, 1123–24 (5th Cir.1976). Irreparable injury in this context, however; means only that the plaintiff must show that, absent an injunction, "the harm that has or will occur cannot be repaired." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2944, at 95 (1995); *accord, e.g., Studebaker Corp. v. Gittlin*, 360 F.2d 692, 698 (2d Cir. 1966) (Friendly, J.).

The cases in this circuit demonstrate that the irreparable harm requirement is satisfied, at the preliminary injunction stage, where a supply cutoff would obliterate a dealer's business, deprive the dealer of "a relatively unique product," or be difficult to quantify in damages because harm would extend to sales of other products. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37–38 (2d Cir.1995) (collecting cases). In *Tom Doherty*, the Court summarized the case law as follows:

"These cases stand for the general proposition that irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial. Generally, where we have found no irreparable harm, the alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions.

"We believe that the governing principle is as follows. Where the availability of a product is essential to the life of the business *or* increases business of the plaintiff beyond sales of that product—for example, by attracting customers who make purchases of other goods while buying the product in question—the damages caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss. In such cases, injunctive relief is appropriate. This rule is necessary to avoid the unfairness of denying an injunction to a plaintiff

on the ground that money damages are available, only to confront the plaintiff at a trial on the merits with the rule that damages must be based on more than speculation. Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation. Where the loss of a product will cause the destruction of a business itself or indeterminate losses in other business, the availability of money damages may be a hollow promise and a preliminary injunction appropriate." *Id.* at 38 (citations omitted; emphasis in original).

It is important to focus also on the fact that the availability of injunctive relief at an interlocutory stage presents different considerations than after a trial on the merits. As one leading commentator has written:

"Although the vocabulary of adequate remedy and irreparable injury is common to both preliminary and permanent relief, the competing considerations are quite different at the two stages of litigation. Denying relief at the preliminary stage protects defendant's right to a full hearing, and a stringent variation of the irreparable injury rule lets the court openly balance the risks to each side. Preliminary relief is best considered as a separate issue, only distantly related to the choice of remedy at final judgment.

"At the stage of permanent relief, specific relief is problematic only occasionally. Sometimes it imposes undue hardship or interferes with countervailing rights." Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 HARV.L.REV. 687, 691–92 (1990) (footnotes omitted).

In this case, the quantification of damages that would be suffered by plaintiff if AHMC, notwithstanding its violation of the New York Act, were permitted to end the dealership relationship would be extremely difficult for at least three reasons.

First, although plaintiff has been selling Acuras for a number of years, and therefore has an established sales record, that record has been seriously affected by the decline in the appeal of Acura automobiles nationwide, a trend that only recently has begun to turn

around. To award damages on the basis of plaintiff's past record in these circumstances would deprive it of compensation for the upturn that seems in prospect. Alternatively, any attempt to take the upturn into account would force the Court to attempt to determine the likely extent and duration of the upturn and of plaintiff's participation in it—both fairly speculative endeavors.

Second, it is important to recognize that the name of the plaintiff corporation, Bronx Auto Mall, Inc., reflects a merchandising concept. Plaintiff has established an "auto mall" on East Tremont Avenue. Plaintiff sells new Hondas at 2543 and new Chevrolets, Buicks and Acuras at 2541. It also has Suzuki, Hyundai, Mazda and Volvo showrooms at 2621 and 2625, which are located very close by. Prospective car buyers may shop for a car in plaintiff's adjacent facilities in much the same way that millions of Americans wander from book stores to department stores to record shops to boutiques in shopping malls all over the country. According to data provided by plaintiff, Acura contributes disproportionately to the sales and profits of the overall enterprise. (*See* PX B, ¶ 25) (20% of gross profit) Given this fact, the physical proximity of the new car showrooms for the eight car lines, and plaintiff's "auto mall" merchandising approach, the Court infers that the business as a whole benefits from its ability to offer such a broad line of vehicles at essentially one location and, moreover, that some part of the showroom traffic is generated in the first instance by customers drawn by the presence of Acuras. The loss of the Acura line, the Court finds, therefore would have adverse effects on the sales of plaintiff's other models, quantification of which would be difficult if not impossible.

Third, even assuming that the loss of sales and profits for any given period could be determined with acceptable accuracy, there would be a substantial issue as to the period of time for which plaintiff should be permitted to recover. The Court has not determined that AHMC never may terminate or

decline to renew this franchise—only that its effort to do so on this occasion did not comply with New York law. In consequence, in order to determine the period for which plaintiff would be entitled to damages, the Court would be forced to determine whether AHMC now has legally valid grounds for termination or non-renewal. If so, it would be compelled to determine whether and when it would be likely to avail itself of those grounds in the future.[27] If not, the Court would be forced to speculate as to whether and when AHMC would be likely to have and to take advantage of other grounds in the future.

To be sure, an injunction in this case will force AHMC, at least for a time, to continue supplying a dealer that it wishes to be rid of. But the hardship, if hardship there would be, is limited. The grounds on which relief is granted here are quite narrow, and Bronx Acura certainly has not been given *carte blanche* to disregard its obligations to AHMC. Moreover, the parties may well find it in their mutual interest to reach an appropriate *modus vivendi*, as indeed existed in the early years of their relationship.

In all the circumstances, the Court finds that plaintiff, absent an injunction, will suffer irreparable injury for which it has no adequate remedy at law. Accordingly, plaintiff would be entitled to a permanent injunction independent of the provisions of Section 469 of the New York Act.

*Conclusion*

For the foregoing reasons:

1. Defendant is enjoined and restrained from declining to renew or terminating the franchise of Bronx Auto Mall, Inc. in whole or in part because the latter has failed or hereafter fails to make the changes to the parts and service departments listed in paragraphs A.4, A.8, A.15, B.1, and B.2 of PX 59 and from relying upon the notice of non-renewal contained in the letter, dated Octo-

**27.** For example, if the Court were to determine that AHMC properly could terminate Bronx Acura because it wishes to reduce the number of Acura dealers, it still would have to determine whether AHMC would be likely openly to take the position that it is prepared to terminate dealers on that ground. It steadfastly has resisted such a conclusion here, no doubt at least in part out of concern about the effect of its doing so on its relations with other Acura dealers.

ber 31, 1995, from Daniel G. Crowe of AHMC to Harold N. Schlanger (PX 105).

2. The plaintiff shall recover of the defendant the costs and disbursements of this action plus a reasonable attorney's fee. Application for the attorney's fee shall be made in accordance with the Federal Rules of Civil Procedure.

SO ORDERED.

*Appendix*

Premises at 2541 and 2543 East Tremont Avenue

Premises at 2621 to 2639 East Tremont Avenue

